UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL PROVENZANO                          CIVIL ACTION

VERSUS                                       NO. 09-7144

MICHAEL J. ASTRUE, COMMISSIONER              SECTION "D" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Michael Provenzano, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act. 42 U.S.C. §§ 405(g), 423. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

I.      PROCEDURAL HISTORY

Provenzano filed an application for DIB on September 25, 2007, alleging disability since February 2, 2006, due to a neck injury and anxiety. (Tr. 134-41, 145, 150). After his application was denied, he requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 27, 2009. (Tr. 22-90). On March 30, 2009, the ALJ issued a decision granting plaintiff's application for the time period after August 6, 2007, but denying the application as to the time period between the alleged

onset date of February 2, 2006 and August 6, 2007. (Tr. 11-20). After the Appeals

Council denied review on September 4, 2009, the ALJ's decision became the final

decision of the Commissioner for purposes of this court's review. (Tr. 1-4).

II.     STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.      The ALJ erred by giving no weight to the opinion of an examining
        physician, D.J. Scimeca, Jr., M.D.

B.      The ALJ erred by giving controlling weight to the residual functional
        capacity opinion of a lay person.

C.      The ALJ's determination of plaintiff's residual functional capacity during
        the time period of February 2, 2006 through August 6, 2007 is not
        supported by substantial evidence.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.      For entitlement to DIB, plaintiff met the insured status requirements of the
        Act through December 31, 2006 only. Therefore, he must establish
        disability on or before that date.

2.      He has a severe impairment, consisting of disorders of the spine.

3.      Prior to August 6, 2007, the date when he became disabled, Provenzano
        had the residual functional capacity to lift and carry ten pounds
        occasionally and less than ten pounds frequently and to push and pull these
        amounts of weight. He could stand and/or walk for two hours and sit for
        six hours in an eight-hour work day. He could frequently kneel, crouch and
        crawl; occasionally balance, stoop and climb ramps and stairs; and never

2

climb ropes, ladders or scaffolds. He could occasionally reach in all directions, including overhead.

4. The ALJ assigned "no weight" to the "impression" of an examining physician, D.J. Scimeca, Jr., M.D., that Provenzano was "totally disabled" from performing any occupation.

5. The ALJ "adopted" his residual functional capacity assessment "from the opinion of the state agency medical consultants rendered in November of 2007, to which the [ALJ] assigns significant weight as it is well supported by the objective evidence as a whole."

6. Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

7. After August 6, 2007, plaintiff had only the ability to lift no more than ten pounds occasionally, to stand and/or walk less than two hours and to sit no more than two hours in an eight-hour work day. These functional limitations precluded him from even sedentary work activity. Therefore, he became disabled on that date.

8. Provenzano was unable to perform his past relevant work since the alleged onset date of disability. However, prior to August 6, 2007, he could perform jobs that are available in significant numbers in the national economy, including dispatcher, information and records clerk, general office clerk, customer service representative, order clerk, assembler and cashier.

(Tr. 11-19).

IV.   ANALYSIS

A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393. This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). The Commissioner, rather than the courts, must resolve conflicts in the evidence. Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether

substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the

Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton,

209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that he is

unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations

that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§

404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2009).  The regulations

include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920;

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1]  The five-step

_____

[1]The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).
Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).
Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).
Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174.

---

claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

B.     Factual Background

Provenzano testified that he was born in 1965.  He is married and has three minor children living with him and one 20-year-old daughter who lives on her own.  (Tr. 34).  He stated that, at the time of his motor vehicle accident, he worked for the Washington Parish Sheriff's Department as a patrolman, patrolling the streets and highways of the parish.  He said he worked for the Sheriff's Department from November 2001 until February 2006.  (Tr. 36).  Plaintiff testified that, for two years before and during Hurricane Katrina,[2] he was an investigator, which, in the Washington Parish Sheriff's Department, is the same as a detective and is not a higher ranking officer than a patrolman. (Tr. 36-37, 74).  He stated that he was transferred to street patrol because the department had lost some patrolmen after the hurricane and needed more manpower on the streets.

Provenzano said he was a police officer for the Franklinton Police Department from 1997 until November 2001.  He testified that he worked as a department manager at Walmart from 1993 to 1997, a security guard from 1990 to 1993 and a deckhand before that.  (Tr. 75-76, 80-81).  He testified that, as a security officer at Beau Chene Subdivision, he worked a twelve-hour shift, checking residents, guests and service people

_____

[2]On the morning of August 29, 2005, Hurricane Katrina struck along the coast of the Gulf of Mexico, devastating portions of Louisiana and Mississippi."  In Re Katrina Canal Breaches Litig., 495 F.3d 191, 195-96 (5th Cir. 2007).

in and out at the gate. (Tr. 77). He stated that, by the time he left that job, he had been promoted to a captain's rank and a district supervisor. As a district supervisor, he supervised 40 guards who worked at two subdivisions and construction sites and he reported directly to the owner of the company. (Tr. 78-79).

Plaintiff testified that he was injured while working and that he received the equivalent of worker's compensation through the Sheriff's Blue Cross/Blue Shield policy, which covered his salary for a limited time. (Tr. 37-38). He said he took medical retirement and currently receives more than $900 per month from that plan.

Provenzano stated that he was referred to the NORTH Institute[3] for medical treatment by a lawyer who has been a friend of his for fifteen years. He said he did not know who Michelle Gregg is at the NORTH Institute, but he knows that Michael Beninato is an assistant practitioner there, which he assumed was almost like a doctor. (Tr. 38-40). He testified that he did not recall seeing Beninato on a consistent or constant basis in 2006, but said he would have seen Beninato a couple of times, then he would have been seen by Dr. Bryant or Dr. Dietze.[4] (Tr. 40-41).

---

[3]According to the medical records, the NORTH Institute is in Lacombe, Louisiana. NORTH is an acronym for Neurological Orthopaedic Rehabilitation Total Health. (Tr. 245).

[4]Susan J. Bryant, M.D., is a specialist in physical medicine and rehabilitation. (Tr. 245). Donald D. Dietze, M.D., is a board certified neurosurgeon. (Tr. 200). Both physicians practice at the NORTH Institute. (Tr. 245).

Plaintiff testified that Dr. Dietze performed neck fusion surgery on him in April 2006. He agreed that the medical records from the NORTH Institute from December 2006 showed that he had seen Beninato on that date and that he had complained of increased neck pain during the previous three to four days with some numbness when the weather was cold and some loss of sleep due to pain. (Tr. 42). He confirmed that he was taking Lortab 10[5] for pain five times per day or every four hours at that time, but he did not recall what other medications he was taking. (Tr. 42-43). He testified that the "marked improvement" mentioned in the medical records was not much of an improvement and that it was only an improvement from "a very serious state." (Tr. 43).

Provenzano said he did not understand what Dr. Bryant meant when she wrote two weeks later that he appeared to be doing well and to have achieved the predominant goals of surgical intervention. (Tr. 43-44). He stated that there was some improvement after his first surgery in April 2006, but he did not consider it a great or marked improvement. (Tr. 44). He testified that he has been under anesthesia five or six times in the past three years and has had local anesthesia for cervical spine injections, and therefore does not

---

[5]Lortab 10 is a combination of 10 mg. of hydrocodone, a semisynthetic narcotic (opioid) analgesic, and 500 mg. of acetaminophen, a non-opiate analgesic, and is indicated for the relief of moderate to moderately severe pain. The usual adult dosage in 2005 was one tablet every four to six hours as needed for pain, not to exceed six tablets per day. Physicians' Desk Reference 3240-41 (59th ed. 2005).

remember some important things. He said his wife drove him to the hearing and that he does not drive anymore. (Tr. 45).

Plaintiff testified that he remembers a lot of pain after the first surgery from April until December 2006. He said that, from his perspective as the person experiencing the pain and discomfort, he did not have an excessively marked improvement. (Tr. 51). He explained that there was improvement but that he continued to experience a large amount of pain and a significant amount of discomfort, of which he complained to his doctors.

Provenzano said he still has problems with his left hand and arm that date back to 2006. He denied the medical progress note dated two weeks after the surgery, which said that he no longer had headaches or upper extremity pain. (Tr. 52). He said that he continued to have headaches right after the surgery. He stated that he was told that the headaches were probably caused by a blockage in his spinal fluid, which opened up after the surgery. He said the headaches lessened, but he still had them within two weeks after the surgery. (Tr. 52-53). Plaintiff testified that he continued to have upper extremity problems one month after the surgery and that physical therapy had aggravated his symptoms, instead of helping them. (Tr. 53-54). He did not recall how long he went to physical therapy, but it was not long before his doctors recommended that he stop going because his pain increased as a result of the therapy. He did not remember an incident

of lower mandibular numbness reported on a progress note dated June 14, 2006. (Tr. 54-55). He confirmed that Dr. Bryant prescribed Percocet[6] to help him sleep in June 2006.

Plaintiff recalled having sharp shooting pain that radiated down his right arm after the physical therapy, as he reported to his doctor on August 7, 2006. (Tr. 55). He "vividly" remembered that, when he laid down to rest or to sleep, the arm on the side on which he was lying would go completely numb. (Tr. 55-56). He recalled times when he laid on his back and had to nudge his wife with his knee because he had no feeling in either arm and could not move his hands. He agreed with a notation on August 7, 2006 that his pain and numbness were increasing at that time. He stated that Dr. Dietze did not treat him for his lower back symptoms. (Tr. 56).

Provenzano stated that his pain continued to worsen in his head, neck, right shoulder and right arm to the elbow through August 2006 and that he stayed in bed a lot of the time. He said his fine motor skills also decreased. He stated that he had gone to the emergency room about 100 times between February 2006 and the day of the hearing, and probably went three to four times in 2006. (Tr. 57). He agreed with the note dated

---

[6]The medical records indicate that Dr. Bryant prescribed Percocet 10/325. (Tr. 247). Percocet is a combination of 10 mg. of oxycodone hydrochloride, a pure opioid agonist whose principal therapeutic action is analgesia, and 325 mg. of acetaminophen. It is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1121 (64th ed. 2010). An agonist is "a drug that has affinity for and stimulates physiologic activity at cell receptors normally stimulated by naturally occurring substances." Dorland's Illustrated Medical Dictionary 40 (29th ed. 2000).

October 2006 that he had continued to have right cervical pain and spasms from time to time and that he had discontinued physical therapy because it made him hurt. He recalled that he was told to try to do home exercises to increase his range of motion and that he was prescribed a TENS unit.[7] (Tr. 59).

Plaintiff testified that the records show that he improved a bit every time his activity lessened, but that he went "downhill" whenever the doctors tried to get him to be active again. (Tr. 60). He said he recalled his neck pain going downhill in December 2006. He explained that a reported increase in his neck pain does not mean that he was ever out of pain. He stated that his numbness and tingling increased when the weather got colder. (Tr. 61). Provenzano recalled that his doctors discussed pain management with him a couple of times, but he did not recall the dates. (Tr. 62). He confirmed that he told Dr. Bryant on December 18, 2006 that Percocet controlled his pain better than Lorcet. He said he remembered taking both drugs daily for a while, but could not remember when that started and stopped. (Tr. 62).

Provenzano testified that he had two more major surgeries on his neck in October 2007 and February 2008 and that he also had injections in his neck. He said he has three cages, two plates and seven screws in his neck. He stated that his entire cervical spine

---

[7]A TENS unit provides transcutaneous electrical nerve stimulation, "a treatment that uses electrical current to relieve pain." <u>Ruffalo v. Barnhart</u>, 66 F.App'x 56, 58 (7th Cir. 2003).

has been rotated 10 degrees on its axis.  Plaintiff testified that there has never been a time since the accident when he did not know that his career and most of his abilities as a husband and father were over.  He explained that he cannot throw a football to his 14-year-old son or make love to his wife and that there has never been a time since the first surgery when he has not had pain in his neck and upper extremities.  He stated that he had the two additional surgeries because of the continuation of his symptoms.  (Tr. 63).

Plaintiff said he does not drive anymore because he is afraid that he will be blamed if he gets in an accident, regardless whether he was at fault, because he cannot turn his neck and look out the driver's side window, but has to rotate at the waist to turn and look. He testified that he has very limited range of motion in his neck and greatly decreased abilities in his left arm and hand.  He said he still loses feeling in his upper extremities when he lies down and that he sleeps very little.  He stated that he had only slept about four and one-half hours total in the past three days.  He said he has had all of these problems for the past three years.

Provenzano testified that he was sent to Dr. Scimeca when he applied for disability with the Sheriff's Department and that Dr. Scimeca examined him.  (Tr. 64-65).  He said he complained to Dr. Scimeca of headaches, neck pain and intermittent pain that radiated to both shoulders, greater on the right than the left, and decreased range of motion in both his neck and his lumbar spine.  (Tr. 65).  He stated that he receives full disability

retirement benefits from the Sheriff's Department based on a finding of total disability from any type of work.

Plaintiff testified that he had low back problems before the accident, for which he was treated by Dr. Dennis[8] with injections in his lumbar spine. (Tr. 66). He said he continued to receive treatment from Dr. Dennis for his low back after the accident and that he eventually had an MRI of his lumbar spine. However, he said his insurance carrier declined to pay for an MRI of his lumbar spine when Dr. Dietze requested it, apparently because Dr. Dietze was treating him only for his neck problems as a result of the accident. (Tr. 67-68).

Provenzano stated that he was in pain management with Dr. Dennis of North Shore Pain Management in January 2006 and that he received pain medications, injections and conservative treatment so that he could keep working. (Tr. 68). He testified that the accident happened on February 2, 2006 and that he continued to complain about and be treated for low back pain after the accident, including having nerve root injections in his lumbar spine on February 14 and March 3, 2006. He said his low back pain also radiated into both legs, but his left leg was worse than his right leg, both then and now. (Tr. 68-69).

---

[8]Mark S. Dennis, M.D., is a pain management specialist. (Tr. 229).

Plaintiff said that Dr. Dietze took over most of his care because he needed neck surgery and he did not see Dr. Dennis again until February 5, 2007, when Dr. Dennis gave him more lumbar spine injections. He testified that he spent most of his time in bed during that period and that he was so limited in his activities that he did not want to ride in a car for 25 to 30 minutes to see Dr. Dennis. (Tr. 70-71). He said he saw no point in seeing Dr. Dennis before February 5, 2007 because Dr. Dietze was prescribing injections and more pain medications for him than Dr. Dennis had been. He testified that he was never out of pain in his low back and left leg from April 2006 through December 2006. (Tr. 71).

C.    <u>Vocational Expert Testimony</u>

A vocational expert, Todd Capielano, testified at the hearing. He stated that plaintiff's past relevant job as a police patrol officer is classified as medium, skilled work while his job as an investigator/detective is considered light, skilled work. (Tr. 73-74). He said that plaintiff's past relevant job as a department manager in a retail store is classified as medium and skilled, and as a deckhand as heavy, semi-skilled work. (Tr. 75, 81). He stated that the job of security officer is considered light and semi-skilled, while the job of security supervisor is light and skilled. (Tr. 79).

The ALJ posed a hypothetical of an individual with plaintiff's age, education and work history who could lift and carry ten pounds occasionally and less than ten pounds

frequently, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds. The hypothetical person should avoid exposure to heights and hazards in the workplace and is markedly limited in the ability to reach overhead. (Tr. 81-82). Capielano testified that the person could not perform any of the past relevant work, because all of those jobs were at the light exertional level and above. (Tr. 82). He stated that the hypothetical person could perform sedentary jobs that are available in Louisiana, such as dispatcher, information and record clerk, general office clerk, customer service representative, order clerk, assembler and cashier. (Tr. 82-83). He said the numbers of available jobs would not be diminished by the limitations of the hypothetical.

Upon cross-examination by plaintiff's attorney, the vocational expert testified that there would be no jobs that the hypothetical person could perform if he was markedly limited in repetitive neck movements in all directions; repetitive hand movements, both fine and gross, bilaterally; and bending, lifting and reaching. (Tr. 83-84).

Plaintiff's attorney posed a new hypothetical of a person who needs to take a morning and an afternoon break, each exceeding 30 minutes, and a 30-60 minute lunch break. Capielano testified that such lengthy breaks exceed the standard, 15-minute

morning and afternoon breaks and that these limitations would require an employer to make special accommodations. (Tr. 84-88).

A third, new hypothetical by plaintiff's counsel posited an individual who needs to take more frequent rest breaks than the three normal breaks in a work day. The vocational expert testified that whether that person could work would depend on how frequent and how long the breaks would be. (Tr. 88-89).

In response to the next hypothetical by Provenzano's attorney, Capielano testified that a person who regularly missed work more than three times per month would be unable to sustain employment and would be terminated by the employer. (Tr. 89). The final hypothetical by plaintiff's attorney was an individual with marked impairments in comprehension, persistence, pace and memory as a side effect of prescription medications. Capielano stated that such a person would not be able to perform any kind of work. (Tr. 89-90).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 15-17). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

    1.    The ALJ did not err by giving no weight to the opinion of an examining physician, D.J. Scimeca, Jr., M.D.

Provenzano argues that the ALJ erred by giving no weight to the opinion of D.J. Scimeca, Jr., M.D., an occupational medicine specialist.  Dr. Scimeca examined plaintiff on October 30, 2006 at the request of the Louisiana Sheriffs' Pension and Relief Fund and wrote a report dated November 2, 2006.  Dr. Scimeca reviewed "the available medical records," took plaintiff's history, performed a physical examination and opined that plaintiff is totally disabled from performing his duties as a deputy sheriff and "is totally disabled from any other occupation secondary to intractable cervical pain and diminished range of motion."  (Tr. 196-98).

The ALJ found that he need not accept Dr. Scimeca's conclusion that plaintiff is totally disabled from performing any occupation.  It is well established that a physician's statement that a patient is disabled does not mean that the patient is disabled for purposes of the Act, because that is a determination that may be made only by the Commissioner. Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Tamez v. Sullivan, 888 F.2d 334, 336 n.1 (5th Cir. 1989).

> [S]ome opinions by physicians are not medical opinions, and as such have no "special significance" in the ALJ's determination.  Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work."  These determinations are

legal conclusions that the regulation describes as "reserved to the Commissioner." . . . The doctor's opinion [that plaintiff could not work] was not a medical opinion within the meaning of the regulation.

Frank, 326 F.3d at 620 (quoting 20 C.F.R. § 404.1527(e), (1) & (e)(3)). Therefore, the ALJ stated that he "gives no special significance to opinions . . . on issues reserved to the Commissioner. Thus, Dr. Scimeca's impression is entitled to no weight." (Tr. 15).

Provenzano concedes that the ALJ is not required to afford controlling weight to Dr. Scimeca's conclusion that plaintiff is disabled, but he argues that the ALJ improperly "ignored" Dr. Scimeca's entire opinion. Plaintiff cites Social Security Ruling 96-5p, which provides that "opinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner." Social Security Ruling 96-5p, 1996 WL 374183, at *3 (July 2, 1996).

Contrary to plaintiff's argument, the ALJ did not completely ignore Dr. Scimeca's opinion. In recounting plaintiff's injuries and treatment during the months following the car accident, the ALJ accepted nearly verbatim Dr. Scimeca's summary of plaintiff's medical records prior to November 2006 (some of which are not otherwise in the administrative record) and the ALJ summarized Dr. Scimeca's findings on physical

examination. (Tr. 15). The ALJ rejected only Dr. Scimeca's "impression" or conclusion concerning the legal issue of whether Provenzano was disabled as of that date.

Furthermore, "[t]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Newton, 209 F.3d at 455 (citing Paul v. Shalala, 29 F.3d 208, 211 (5th Cir. 1994); Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999)). The opinion of any physician may be assigned little or no weight when good cause is shown. Good cause may permit an ALJ to discount the weight of an opinion when it is conclusory; unsupported by medically acceptable clinical, laboratory, or diagnostic techniques; or otherwise unsupported by the evidence. Id. at 455-56 (citing Brown, 192 F.3d at 500; Greenspan, 38 F.3d at 237; Paul, 29 F.3d at 211).

Dr. Scimeca examined Provenzano only once on October 30, 2006. Although the medical records from plaintiff's treating physicians indicate that he was not working at that time, none of his treating physicians opined that he was permanently disabled. In addition, the medical records from his treating physicians both before and after that date, which the ALJ considered in making his findings, indicate that plaintiff's symptoms generally continued to improve. The opinions of treating physicians are usually entitled to great weight. Id. at 455. Thus, the contradictory evidence from the rest of the record provides good cause for the ALJ's decision to afford no weight to Dr. Scimeca's opinion.

Accordingly, this argument lacks merit.

2. The ALJ did not give "controlling weight" to the residual functional
capacity opinion of a lay person.

Provenzano argues that the ALJ erred by giving "controlling weight" to a residual

functional capacity assessment dated November 27, 2007 because the assessment was

signed by a Social Security Administration disability examiner, not by a treating medical

source. (Tr. 14, 370-77). Plaintiff relies on Social Security Ruling 96-2p, which defines

"controlling weight" as

> the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the
> weight we give to <u>a medical opinion from a treating source that must be
> adopted</u>. . . . Although opinions from other acceptable medical sources
> may be entitled to great weight, and may even be entitled to more weight
> than a treating source's opinion in appropriate circumstances, opinions
> from sources other than treating sources can never be entitled to
> "controlling weight."

Social Security Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996) (emphasis added).

Plaintiff argues that because the ALJ stated that he "adopted" the residual functional

capacity assessment, the ALJ erroneously gave the opinion "controlling weight."

Contrary to plaintiff's argument, the ALJ did <u>not</u> assign "controlling weight" to

the opinion. The ALJ understood that the opinion was not signed by a <u>treating</u> source,

and he did not use the "controlling weight" language. Rather, the ALJ stated that he

"adopted" the residual functional capacity assessment "from the opinion of the state

agency medical consultants rendered in November of 2007, to which the [ALJ] assigns

significant weight as it is well supported by the objective evidence as a whole." (Tr. 14) (emphasis added). The ALJ's use of the word "adopted" does not mean that he gave the residual functional capacity assessment "controlling weight," especially in light of his statement that he gave the opinion only "significant weight."

Although the ALJ erroneously stated that the residual functional capacity assessment was rendered by "medical consultants," the court "must still determine whether this error was harmless. Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected." Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007) (quotation and citations omitted). "Procedural errors constitute bases for remand only where they cast into doubt the existence of substantial evidence to support the ALJ's decision." Hammond v. Barnhart, 124 F. App'x 847, 852 n.10 (5th Cir. 2005) (citing Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988)).

Provenzano has not shown that he suffered any prejudice from the ALJ's error in adopting the residual functional capacity assessment that was not signed by a medical source. The ALJ considered the evidence fully in assessing plaintiff's residual functional capacity. The ALJ specifically stated that the November 27, 2007 residual functional capacity assessment was "well supported by the objective evidence as a whole" and that

no new evidence in the record after that date was "sufficiently persuasive to alter the functional limitations" for the time period in question. (Tr. 14).

Accordingly, this assignment of error lacks merit.

3.    The ALJ's determination of plaintiff's residual functional capacity during the time period of February 2, 2006 through August 6, 2007 is supported by substantial evidence.

Provenzano argues that substantial evidence does not support his residual functional capacity to perform the jobs listed by the ALJ during the time period of February 2, 2006 through August 6, 2007. At step four of the sequential evaluation, the ALJ found that plaintiff had the residual functional capacity during that time period to perform sedentary work with the limitations listed in the decision, but that plaintiff could not perform any of his past relevant work. At step five, the ALJ found that Provenzano could perform other jobs that were available in significant numbers in the national economy, including dispatcher, information and records clerk, general office clerk, customer service representative, order clerk, assembler and cashier.

Substantial evidence supports the ALJ's decision. First, the ALJ found that plaintiff's allegations concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's residual functional capacity assessment. The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility

conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)). Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court. McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009) (citation omitted); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007) (citation omitted). The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required. Spruill, 299 F. App'x at 358; Falco, 27 F.3d at 163-64; Godbolt v. Apfel, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999) (Vance, J.); accord James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163).

Whether pain is disabling is also an issue for the ALJ,

who has the primary responsibility for resolving conflicts in the evidence. It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference. The determination whether an applicant is able to work despite some pain is within the province of the administrative agency and should be upheld if supported by substantial evidence. Moreover, pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment to be disabling. Subjective complaints of pain must also be corroborated by objective medical evidence.

Chambliss, 269 F.3d at 522 (citing Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991); James v. Bowen, 793 F.2d 702, 706

(5th Cir. 1986); Jones v. Heckler, 702 F.2d 616, 622 (5th Cir. 1983); Falco, 27 F.3d at

163; Houston v. Sullivan, 895 F.2d 1012, 1016 (5th Cir. 1989)).

> As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. Additionally, the mere existence of pain does not automatically bring a finding of disability. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.

Davis v. Astrue, No. H-08-1993, 2009 WL 3190470, at *15 (S.D. Tex. Sept. 29, 2009)

(citing Chambliss, 269 F.3d at 522; Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989);

Brown v. Bowen, 794 F.2d 703, 707 (D.C. Cir. 1986); Johnson v. Heckler, 767 F.2d 180,

182 (5th Cir. 1985); Hames v. Heckler, 707 F.2d 162, 166 (5th Cir. 1983); Epps v.

Harris, 624 F.2d 1267, 1274 (5th Cir. 1980); Owens v. Heckler, 770 F.2d 1276, 1281 (5th

Cir. 1985)).

The ALJ in this case explained that Provenzano's allegations of severe pain and

extreme functional limitations were not fully supported by the medical evidence. The

ALJ provided a thorough, accurate summary of the medical records. Based on that

evidence, he concluded that plaintiff had shown medical improvement in the months

following his first surgery in April 2006, until the medical evidence demonstrated that

his condition had worsened and he could no longer perform any work as of August 6,

2007. Rather than showing that plaintiff's pain was constant, unremitting and wholly

unresponsive to therapeutic treatment, the medical record demonstrates that his pain was

alleviated to a large extent by medication and injections. Plaintiff's residual functional capacity to perform sedentary work with the limitations listed in the ALJ's decision prior to August 6, 2007 is substantially supported by the medical records.

This court may not "reweigh the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." <u>Newton</u>, 209 F.3d at 452. Although I might have reached a different conclusion based on this record if I were the initial factfinder, this court's role is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact. Such substantial evidence exists here.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ did not err by according no weight to the conclusory opinion of Dr. Scimeca that plaintiff was disabled. The ALJ did not give controlling weight to the residual functional capacity opinion of a non-medical source. To the extent that the ALJ erred by adopting the residual functional capacity assessment of a non-medical source, that error did not prejudice plaintiff because the ALJ's determination of plaintiff's residual functional capacity during the time period of February 2, 2006 through August 6, 2007 is supported by substantial evidence.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[9]

New Orleans, Louisiana, this ___26th___ day of July, 2010.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[9]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.